**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.                                                    Case No.  3:05-cr-108-J-32MMH

LOVARNSO A. WALKER
   a/k/a Scoot
_____/

**REPORT AND RECOMMENDATION**[1]

This cause is before the Court on Defendant's Second Motion to Suppress Results

of Illegal Seizure and Search on December 16, 2004 (Dkt. No. 22; Second Motion to

Suppress), which was filed on May 27, 2005.  The government opposes the Second Motion

to Suppress.  See United States' Response in Opposition to Defendant's Second Motion

to Suppress Results of Illegal Seizure and Search on December 16, 2004 (Dkt. No. 27;

Opposition), filed on June 16, 2005.[2]  The undersigned originally scheduled the evidentiary

hearing on the Second Motion to Suppress for June 17, 2005.  See Order (Dkt. No. 23).

However, prior to the presentation of any evidence on that motion, the parties raised the

issue that Defendant's counsel may have a potential conflict of interest with the

_____

[1]      Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and
Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days
after service of this document.  Failure to file timely objections shall bar the party from a de novo
determination by a district judge and from attacking factual findings on appeal.

[2]      Prior to the evidentiary hearing on July 1, 2005, the government filed the United
States' Supplemental Memorandum of Law in Response to Defendant's Second Motion to
Suppress Results of Illegal Seizure and Search on December 16, 2004 (Dkt. No. 36; Supplemental
Memorandum).

representation of Defendant in this matter.  See Transcript of Motion to Suppress Proceedings (Dkt. No. 32; First Tr.) at 84-86.  Thus, the Court continued the evidentiary hearing pending resolution of that issue.  See id. at 93-94.

After the issue regarding counsel was resolved on July 1, 2005, the undersigned completed the evidentiary hearing.  See Clerk's Minutes (Dkt. No. 38).  At its conclusion, Defendant's counsel requested an opportunity to provide further briefing on a discrete issue.  See Transcript of Motion to Suppress Proceedings (Dkt. No. 47; Second Tr.) at 111.  The Court granted that request, and Defendant filed his Memorandum of Law (Dkt. No. 45; Defendant's Memorandum) on July 6, 2005, and the government filed its responsive memorandum, see United States' Memorandum of Law Addressing Issues Raised at Suppression Hearing Held on July 1, 2005 (Dkt. No. 46), on July 7, 2005.  Thus, the Second Motion to Suppress has been fully briefed and is now ripe for resolution.

I.    **Evidence and Testimony**

Two witnesses testified at the July 1, 2005 evidentiary hearing:  Defendant Lovarnso Adell Walker, Jr., and Detective Christopher Ryan Middleton.[3]  See Second Tr. at 8, 22.

Defendant was previously arrested on July 30, 2004, and charged with trafficking in cocaine.  See Government's Ex. 2; see also Report and Recommendation (Dkt. No. 51).  Defendant was released on bond on August 17, 2004.  See Defendant's Ex. 5; Government's Ex. 2.

---

[3]    Detective Middleton is employed as a narcotics and vice detective with the Putnam County Sheriff's Office and has been so employed for about two years.  See Second Tr. at 22.  He has worked for the Putnam County Sheriff's Office for a total of almost four years.  See id.

Detective Middleton obtained and executed a search warrant on Defendant's residence during the early morning hours of September 17, 2004.  <u>See</u> Second Tr. at 28, 41, 43.  During this search, the officer found "numerous items of narcotics as well as paraphernalia" in the residence.  <u>Id.</u> at 28.  As a result of this search, Detective Middleton prepared a charging affidavit explaining the new violation of law and presented it to an assistant state attorney.[4]  <u>See id.</u> at 28-30, 46.  After reviewing the information, the assistant state attorney decided to file a motion to revoke Defendant's bond.  <u>See id.</u> at 28-29, 46; <u>see also</u> Defendant's Ex. 7.  Detective Middleton waited while the prosecutor prepared the motion to revoke and a proposed order.  <u>See</u> Second Tr. at 30, 47.

Detective Middleton then went to see Judge A. W. Nichols, III, the assigned judge in the state court proceeding.  <u>See id.</u> at 30; Government's Ex. 2.  The detective explained the circumstances to Judge Nichols and presented the motion to revoke along with a copy of the agency report from the execution of the search warrant.[5]  <u>See</u> Second Tr. at 30, 46-50.  Judge Nichols reviewed the motion and report and issued an order revoking Defendant's bond on September 22, 2004.  <u>See id.</u> at 29-31, 49-50; <u>see also</u> Defendant's Ex. 8.  About ten to fifteen minutes passed from the time the assistant state attorney handed Detective Middleton the documents until Detective Middleton received a signed

---

[4]     The charging affidavit was not attached to the motion and was prepared at the assistant state attorney's request for his benefit in determining whether to file the motion.  <u>See</u> Second Tr. at 50-51.

[5]     The government declined to enter this report into evidence.  <u>See</u> Second Tr. at 98.

order from Judge Nichols.[6]  See Second Tr. at 48-49.  The Order Revoking Bond commanded the arrest of Defendant.  See id. at 30; see also Defendant's Ex. 8.

Defendant testified that he had been told by his attorney, Carl K. Zolezzi, Jr., Esquire, prior to December 16, 2004, that the state may have obtained a warrant for his arrest because "they were putting in an order to revoke [his] bond."  Second Tr. at 14; see also id. at 20.[7]  However, Mr. Zolezzi did not explain the reason for the attempted revocation and Defendant did not otherwise know the reason.  See id. at 20.

On September 29, 2004, Detective Middleton and Lieutenant Merchant traveled to the courthouse to speak with Mr. Zolezzi and explain to him that they had a warrant for Defendant's arrest.  See id. at 31, 53.  Defendant's case had been set for a pretrial conference on that date.  See Defendant's Ex. 1.  The officers were not present in the courtroom during the pretrial conference, but met Mr. Zolezzi in the hallway after it concluded.  See Second Tr. at 53.  Mr. Zolezzi informed Detective Middleton that Judge Nichols directed him to have Defendant present at the next pretrial date, which was October 28, 2004.  See id. at 32.  Mr. Zolezzi further told Detective Middleton that Judge Nichols refused to accept the waiver of personal appearance, and as a result, Judge Nichols reset the pretrial for October 28, 2004, so that Defendant could personally appear. See id. at 32; see also Defendant's Ex. 2.  Detective Middleton later learned that Defendant

---

[6]     Judge Nichols's chambers are in the same building as the State Attorney's Office. See Second Tr. at 47-48.

[7]     Defendant later testified that his attorney never told him that the state filed a motion to revoke his bond.  See Second Tr. at 15.

failed to appear at the October 28, 2004 pretrial conference and that a capias had been issued.   See Second Tr. at 31-32, 54; Defendant's Ex. 9 & 10; Government's Ex. 1.

After the Order Revoking Bond was entered, the detective started his search for Defendant on September 29, 2004, but was unsuccessful in locating him.  See Second Tr. at 52-53.  He renewed his efforts after the issuance of the capias, but again did not find Defendant.  See id. at 54.  On December 15, 2004, Detective Middleton received a call from an informant notifying him that Defendant was traveling throughout Crescent City, Florida.  See id. at 23.  Consequently, Detective Middleton started patrolling the Crescent City area.  See id. at 63.

On December 16, 2004, Defendant left his cousin's house in Crescent City, Florida, driving his green Chevrolet Tahoe.  See id. at 9-10, 16.  Around lunch time on December 16, 2004, Detective Middleton and Detective Azula were traveling south on Highway 17 in an unmarked silver Chevrolet 1500 extended cab truck[8] when they noticed that a vehicle matching the description of one of Defendant's vehicles turned on to Highway 17 from Grove Street.  See id. at 33, 40-41, 55-57.  The detective did not immediately know who was driving the vehicle.  See id. at 58.  Detective Middleton asked the dispatcher to check the tag on the vehicle, and the dispatcher confirmed that the vehicle was registered to Defendant.  See id. at 33, 58-59.  The dispatcher also verified that the arrest warrants were still valid.  See id. at 33-34, 59-60.

---

[8]      This is the same truck that Detective Middleton was driving when he stopped Defendant on July 30, 2004.  See Second Tr. at 41.

Defendant was heading south on Highway 17 when he noticed that a silver truck was following him. See id. at 10. Defendant contends that he could not see the occupants of the truck and did not know who was driving the truck. See id. at 11. In addition, he testified that he could not see any police insignia and did not recognize the truck. See id. at 11, 17. At that point, Defendant turned off of Highway 17 and the truck followed him. See id. at 10-11. As Defendant approached a stop sign, the silver truck pulled in front of him and blocked his path. See id. This location was about a mile and a half from the home of Defendant's cousin's house. See id. at 21.

Detective Middleton has a slightly different recollection of these events. According to Detective Middleton, he started following the vehicle once he verified the registration and the validity of the warrants. See id. at 34. He followed the vehicle as it turned onto Main Street. See id. At that time, Detective Middleton activated his lights, but the vehicle did not stop. See id. at 34, 67, 71-72. As a result, Detective Middleton activated his siren, but that did not cause the vehicle to stop either. See id. at 34. Consequently, when the vehicle started to slow down to obey a stop sign, Detective Middleton pulled in front of it to block the driver's path. See id. at 34-35. The vehicle was forced to stop, and Detective Middleton stepped out of his vehicle. See id. at 35. When Detective Middleton left his vehicle, he was able to verify that Defendant was actually the driver of the vehicle. See id. at 35, 67-68. He ordered Defendant to stop. See id. at 68. At that point, Defendant and Detective Middleton stared at each other. See id. at 69. Then, Defendant backed up his truck and drove around Detective Middleton's vehicle. See id. at 35.

Defendant also testified that after the silver truck blocked his path, he pulled around the truck and started heading west on Highway 308.  See id. at 11.  However, Defendant contends that he did not know who the occupants of the truck were or that police officers ordered him to stop.  See id. at 11-12.  Indeed, he explained that he thought the driver was drunk.  See id. at 19.  While Defendant admits that he was trying to get away from the truck, he testified that the truck did not chase him and he did not exceed the speed limit.  See id. at 14, 19.  The truck continued to follow Defendant, and at that time, he noticed for the first time that the truck had turned on its lights and sirens.  See id. at 11.  Defendant then pulled over into his cousin's yard.  See id. at 11, 17.  He alleges that he only traveled about a quarter of a mile from the location where the silver truck blocked his path to his cousin's house, where he ultimately stopped his vehicle.[9]  See id. at 16-17.

Detective Middleton again recalled these events differently.  After Defendant pulled his vehicle around him, Detective Middleton got back into his truck and followed Defendant.  See id. at 35.  Detective Middleton recalled that while chasing Defendant, he exceeded the speed limit, accelerating up to seventy miles per hour.  See id.  He followed Defendant in this manner for about a mile before Defendant stopped his vehicle.  See id. at 36.

Once he stopped his truck, Defendant contends he voluntarily stepped out of the vehicle and laid down on the ground.  See id. at 12, 18.  Detective Middleton testified that Defendant ignored their verbal commands to exit the vehicle, and had to be physically removed.  See id. at 36-37, 69.  Once has was on the ground, Defendant saw the two

_____

[9]       He previously testified that he traveled the distance of a quarter mile from where he first noticed the lights and sirens to where he stopped his vehicle.  See Second Tr. at 11.

occupants of the silver truck for the first time.  See id. at 12.  The individuals were not

wearing uniforms, and Defendant indicated that he did not see any police insignia or

badges at that time.  See id. at 12, 18.  However, he did recognize one of the occupants

as Detective Middleton.  See id. at 12.  The other individual approached Defendant first.

See id.  Detective Azula handcuffed Defendant, searched him, and then placed him on a

bench.[10]  See id. at 12-13, 18.  During the search of Defendant's person, Detective Azula

found a small bag, containing about three grams of marijuana.  See id. at 18, 37.  Although

Defendant asserts that the officers did not tell him that he was under arrest, see id. at 13,

Detective Middleton testified that when he handcuffed Defendant, he informed Defendant

that they had warrants for his arrest and that he was under arrest for fleeing and eluding,

see id. at 37.[11]

After Defendant was handcuffed and searched, Detective Middleton briefly searched

Defendant's vehicle for additional contraband and called for a marked patrol car to take

Defendant to the jail.  See id. at 13, 37-38, 78.  Detective Middleton indicated that the

search of the vehicle was brief because a crowd was gathering in the area and he did not

feel comfortable completing a detailed search.  See id. at 38, 73.  Detective Middleton's

initial search revealed no contraband.  See id. at 74.  The patrol car then transported

Defendant to the jail.  See id. at 13.

_____

[10]    Detective Middleton testified that he handcuffed Defendant and both officers searched Defendant's person.  See Second Tr. at 37, 72-73.

[11]    Defendant recalled that before he was transported to the jail, the officers told him that they had a warrant for his arrest and that he was being arrested for possession of marijuana under twenty grams and fleeing and eluding.  See Second Tr. at 13-14, 18.  The officers did not explain the reason for the warrant.  See id. at 14.

After Defendant was transported to jail, Detective Middleton instructed Detective Azula to drive Defendant's vehicle to the Sheriff's Office and Detective Middleton followed in his truck.  See id. at 38, 74.  Once Defendant's vehicle arrived at the Sheriff's impound lot, Detectives Azula and Campbell searched it.  See id. at 39.  The detectives found several bags of crack cocaine, which weighed a combined total of 49.1 grams, between the area of the console and the roof.[12]  See id. at 39-40.

## II.   Summary of Argument

Defendant contends that the Order Revoking Bond, see Defendant's Ex. 8, and the capias, see Defendant's Ex. 9, were improperly and illegally issued in violation of the Florida Statutes and the Florida Rules of Criminal Procedure.  See Second Motion to Suppress ¶¶ 8-9; Second Tr. at 83-86, 88.  Specifically, he complains that the Order Revoking Bond was issued without notice and an opportunity to be heard.  See Second Motion to Suppress ¶ 8; Second Tr. at 82-84, 86.  In addition, he asserts that the motion seeking revocation of the bond should have been sworn.  See Second Motion to Suppress ¶ 8; Second Tr. at 111.

Defendant also argues that the capias was improperly issued because the judge wrongly refused to accept his waiver of appearance, there was no notice that his appearance was mandatory at the pretrial conference, and there was no breach of any bond condition.  See Second Tr. at 84, 86-87, 112; see also Second Motion to Suppress ¶ 9.  Defendant alleges that the good faith exception to the exclusionary rule is not

---

[12]   Detective Middleton noticed that the console was ripped from the headliner and there was a six-inch gap between the console and headliner.  See Second Tr. at 39-40.

applicable to excuse these errors because the misconduct is attributable to law enforcement.  See Second Tr. at 88-93, 111-13.  As a result, Defendant contends that the execution of these warrants on December 16, 2004, was illegal and any items seized as a result of the arrest should be suppressed.  See id. at 82, 93.

Defendant also contends that the officers did not have reasonable suspicion to believe that he was the driver of the vehicle that was stopped.  See Second Motion to Suppress ¶¶ 5, 10.  He alleges that he did not violate any traffic laws, including the statutory prohibition against fleeing and eluding, to justify the traffic stop.  See Second Motion to Suppress ¶ 10; Second Tr. at 94, 107-08.  Moreover, Defendant asserts that even if the Court were to find that the stop of the vehicle and arrest of Defendant were valid, the officers did not have probable cause to believe contraband would be concealed in his vehicle, and thus, the detailed search of his vehicle was not proper and any property seized should be  suppressed.[13]  See Second Tr. at 95-96, 114, 117.

---

[13]    While in the Second Motion to Suppress, Defendant argues that "[t]he control exercised by Detective Azula and subsequent search of the impounded vehicle eliminated any exigent circumstances justifying the warrantless search of the vehicle," Second Motion to Suppress ¶ 12, Defendant abandoned this argument at the evidentiary hearing when he conceded that the officers were permitted to seize the vehicle and search it at the impound lot if there was probable cause, see Second Tr. at 116.  As Defendant made this concession, there is no need to consider the authority provided by the government in its Supplemental Memorandum.  The only issue with regard to the search of the vehicle is whether there was probable cause to search the vehicle at the time of Defendant's arrest.  The government does not argue any other exception to the warrant requirement is applicable.  See Second Tr. at 78, 101-02, 113.
    Defendant has also abandoned the argument advanced in the Second Motion to Suppress and at the hearing that he was not violating the law against fleeing and eluding because he was resisting an unlawful arrest.  See Second Motion to Suppress ¶ 10; Second Tr. at 110-11.  He later admitted that an individual cannot resist even an unlawful arrest by fleeing and eluding officers.  See Defendant's Memorandum at 1 (citing State v. McCune, 772 So. 2d 596, 597 (Fla. Dist. Ct. App. 5th 2000)).

On the other hand, the government argues that the Order Revoking Bond and the capias were properly issued and, even if the warrants were not valid, the good faith exception to the exclusionary rule is applicable because the errors cannot be attributed to law enforcement.  <u>See</u> Opposition ¶ 4 n.1; Second Tr. at 97-100, 103-05.  It further asserts that the purpose of the exclusionary rule would not be served in this case.  <u>See</u> Second Tr. at 101.  In addition, the United States argues that another basis for the stop would be the violation of Florida law against fleeing and eluding.  <u>See</u> <u>id.</u> at 105-06, 117.  Finally, the government maintains that the detailed search of Defendant's vehicle at the impound lot was justified because the officers had probable cause to believe that there was contraband in the truck based on the marijuana found on Defendant's person.  <u>See</u> Opposition ¶¶ 5-6; Second Tr. at 102-03.

### III.   Discussion

### A.   Whether Detective Middleton Had Reasonable Suspicion to Stop Defendant's Vehicle[14]

Defendant argues that Detective Middleton did not have reasonable suspicion to conduct an investigatory stop because he did not know who was driving the vehicle.  See Second Motion to Suppress ¶ 5.  The government asserts that the stop was proper.  See Opposition ¶ 4.

"[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity."  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  This standard is equally applicable to vehicle stops.  See, e.g., id. at 1370 n.3.  Reasonable suspicion, however, "requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'"  United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (per curiam) (quoting Tapia, 912 F.2d at 1370); see also United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003).

The officer must have "more than an inchoate hunch, and the [F]ourth [A]mendment accordingly requires that police articulate some minimal, objective justification for an

---

[14]   As the undersigned finds that there was reasonable suspicion to conduct an investigatory stop and that there was probable cause to arrest Defendant based on at least one of the warrants, the Court need not determine whether Detective Middleton also could have stopped and arrested Defendant for fleeing and eluding.  Consequently, while the undersigned recognizes that Defendant and Detective Middleton presented some conflicting testimony regarding this issue, the Court does not have to make a credibility determination or reconcile this conflicting testimony in order to resolve this motion.  The facts relevant to the remaining issues in the Second Motion to Suppress are not in dispute.

investigatory stop." Boyce, 351 F.3d at 1107 (internal quotation marks omitted) (alterations in original); see also Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (recognizing that the Fourth Amendment requires "a minimum level of objective justification for making the stop").  This determination "must be based on commonsense judgments and inferences about human behavior," Wardlow, 528 U.S. at 125, and the Court must consider the totality of circumstances in determining whether there was reasonable suspicion, see United States v. Sokolow, 490 U.S. 1, 8 (1989); see also United States v. Heard, 367 F.3d 1275, 1278 (11th Cir. 2004), cert. denied, 125 S. Ct. 235 (2004) (mem.).  In addition, the officer must have reasonable suspicion before effectuating the stop.  See United States v. Hammack, 604 F.2d 437, 441 (5th Cir. 1979);[15] see also Florida v. J.L., 529 U.S. 266, 271 (2000).  The officer cannot use information learned after the stop to establish reasonable suspicion.  See J.L., 529 U.S. at 271; Hammack, 604 F.2d at 441.

In this case, Detective Middleton knew that two warrants had been issued requiring Defendant's arrest and law enforcement had been looking for Defendant.  See Second Tr. at 23, 28, 32, 42, 52-54.  On December 15, 2004, an informant told Detective Middleton that "Mr. Walker was traveling throughout the Crescent City area."  Id. at 23.  The next day, Detective Middleton saw a vehicle traveling on Highway 17 in the Crescent City area that matched the description of one of Defendant's vehicles.  See id. at 33, 56.  Detective Middleton noticed the vehicle when it pulled out several car lengths in front of him on

---

[15]     This case and all Fifth Circuit cases decided prior to September 30, 1981, are binding precedent pursuant to Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Highway 17.  <u>See</u> <u>id.</u> at 57.  The dispatcher confirmed that the vehicle belonged to Defendant.  <u>See</u> <u>id.</u> at 33, 58-59.  Both Defendant's vehicle and Detective Middleton's truck had tinted windows.  <u>See</u> <u>id.</u> at 56.  Prior to the stop, Detective Middleton was unable to identify the driver of the vehicle with certainty, but suspected that Defendant was driving the truck.  <u>See</u> <u>id.</u> at 58.

The foregoing establishes that Detective Middleton had reasonable suspicion to stop the vehicle to confirm or deny his suspicion that Defendant was the driver of the truck. <u>See, e.g.</u>, <u>Bratcher v. State</u>, 727 So. 2d 1114, 1116 (Fla. Dist. Ct. App. 5th 1999).  Indeed, while Defendant's counsel included this argument in the Second Motion to Suppress, she did not reassert it after hearing the testimony of Detective Middleton.  <u>See</u> Second Motion to Suppress ¶ 5; Second Tr. at 82-96, 106-17.  Accordingly, the undersigned finds that the stop of Defendant's vehicle was proper.

**B.      Whether Defendant's Arrest Was Lawful**[16]

Defendant argues that the state court judge improperly issued a capias for his failure

to appear in person at the October 28, 2004 pretrial conference.  See Second Motion to

Suppress ¶ 9; Second Tr. at 86.  As a result, he contends that there was no probable cause

for the arrest and any evidence obtained as a result of the arrest is due to be suppressed.

See Second Motion to Suppress ¶ 10; Second Tr. at 88.  Defendant contends that the

---

[16]      As the undersigned finds the capias issued on November 2, 2004, provided a proper basis to arrest Defendant, the Court does not have to consider whether the Order Revoking Bond was validly obtained or whether the good faith exception would be applicable to this warrant. Notwithstanding, the undersigned is compelled to comment briefly on Defendant's argument that a defendant must be provided with notice and an opportunity to be heard prior to the revocation of a bond for engaging in further criminal activity.  See Second Tr. at 82-86, 111.

The applicable statutory provision for the revocation of a bond based on the commission of a new crime is Florida Statutes section 903.0471.  This provision was enacted in June 2000 and provides:

> Notwithstanding s. 907.041, a court may, on its own motion, revoke pretrial release and order pretrial detention if the court finds probable cause to believe that the defendant committed a new crime while on pretrial release.

The Florida Supreme Court, in a decision finding this section constitutional, stated, "Under this provision, a court may summarily revoke pretrial release and order detention upon a finding of probable cause that the releasee committed a new crime."  Parker v. State, 843 So. 2d 871, 878 (Fla. 2003).  The court further found that the new statute did not violate the defendant's right to procedural due process even though no adversarial hearing was required prior to the revocation of the defendant's release.  See id. at 879-80.  Moreover, the Fifth District Court of Appeal recently recognized that "[t]here is no indication in the language of section 903.0471, in contrast to section 907.041, that the Legislature intended there to be an adversary hearing or that there be proffered anything other than the kind of evidence required to support an arrest warrant or probable cause determination at first appearances."  Perry v. State, 842 So. 2d 301, 303 (Fla. Dist. Ct. App. 5th 2003).

Defendant's counsel cited the incorrect provisions of Florida law governing the revocation of a bond for the commission of a new crime.  See Perry, 842 So. 2d at 302-03 (finding that section 907.041 does not apply to revocations of bonds pursuant to section 903.0471); Williams v. Spears, 814 So. 2d 1167, 1169 (Fla. Dist. Ct. App. 3d 2002), rev. denied, 888 So. 2d 20 (Fla. 2004) (unpublished table decision); Barns v. State, 768 So. 2d 529, 533 (Fla. Dist. Ct. App. 4th 2000). In addition, the Florida Legislature, in enacting section 903.0471, indicated that "'Rules 3.131 and 3.132, Florida Rules of Criminal Procedure, are repealed to the extent that the rules are inconsistent with this act.'"  Rule 3.131 historical n.; see also Act of June 2, 2000, 2000 Fla. Laws ch. 2000-178, § 5 (2000); Barns, 768 So. 2d at 532.  Thus, Defendant's complaints regarding the alleged lack of due process appear to be without merit.

capias was also improperly issued because there was no breach of a bond condition, the judge wrongfully refused to accept Defendant's waiver of appearance, and Defendant was not provided notice that his personal appearance was mandatory at the October pretrial conference.  <u>See</u> Second Tr. at 84, 86-87; <u>see also</u> Second Motion to Suppress ¶ 9.  In response, the government asserts that the capias was validly issued or, at a minimum, Detective Middleton relied on it in good faith and the evidence should not be excluded.  <u>See</u> Opposition ¶ 4 n.1; Second Tr. at 97, 100, 103-05.  It asserts that the purpose of the exclusionary rule would not be served in this case.  <u>See</u> Second Tr. at 101.

### 1.    Issuance of the Capias

Although the Court does not have sufficient information before it to conclusively determine whether the capias was properly issued, the undersigned is not convinced that the capias was issued improperly.  Contrary to Defendant's argument, <u>see</u> Second Tr. at 84, Defendant's failure to appear did breach a bond condition.  The bond required that Defendant "attend all future court appearances."  Defendant's Ex. 5 ¶ 8.  Moreover, the waiver of appearance was not executed by Defendant.  <u>See</u> Defendant's Ex. 6.  Rule 3.180(a)(3) directs that  "the defendant shall be present . . . at any pretrial conference, unless waived by the defendant in writing."  The First District Court of Appeal has found that a waiver of appearance is ineffective unless it is actually signed by the defendant.  <u>See</u> <u>Hall v. State</u>, 738 So. 2d 374, 375 (Fla. Dist. Ct. App. 1st 1999).  <u>But see</u> <u>Reynolds v. State</u>, 696 So. 2d 1275, 1275 (Fla. Dist. Ct. App. 5th 1997) (per curiam); <u>Emmanuel v. State</u>, 366 So. 2d 513, 514 (Fla. Dist. Ct. App. 2d 1979) (indicating that the rule and applicable case law does not require Defendant to personally sign the waiver).

On the other hand, in order to reject a waiver of appearance, the court must clearly advise the defendant and his or her attorney that the defendant's appearance is required at the pretrial conference and the judge must have a good reason for doing so. See Cruz v. State, 822 So. 2d 595, 596 (Fla. Dist. Ct. App. 3d 2002); see also Walters v. State, No. 1D04-2383, 2005 WL 1523803, at *2 (Fla. Dist. Ct. App. 1st June 28, 2005) (per curiam); Stout v. State, 795 So. 2d 227, 228 (Fla. Dist. Ct. App. 4th 2001) (per curiam); Lynch v. State, 736 So. 2d 1221, 1222 (Fla. Dist. Ct. App. 5th 1999); Emmanuel, 366 So. 2d at 514.

In this case, it is unclear why the state court judge rejected Defendant's waiver. The only evidence in the record is Detective Middleton's testimony regarding his conversation with Mr. Zolezzi on September 29, 2004, and the documents provided by Defendant. Detective Middleton was not present during either pretrial conference. See Second Tr. at 53-54. According to Detective Middleton, Mr. Zolezzi simply told him that the judge did not agree with the waiver and the judge informed Mr. Zolezzi that the Defendant was required to appear in person at the next pretrial hearing. See id. at 32. However, the notice of appearance did not state that Defendant's personal attendance was mandatory and the court docket shows that the notice was returned to the court. See Government's Ex. 2. There is no notation indicating that the notice was resent. See id. While the judge did enter an order setting the first pretrial conference, neither party submitted a copy of that order to the Court. See id. Therefore, if the waiver was properly executed, the record fails to contain sufficient information for the undersigned to conclude that the capias was appropriately issued because it is unclear whether Defendant was advised that the waiver was rejected and the undersigned can only speculate as to why the state court judge

refused to accept the waiver. The Court does not have to resolve this issue, however, in order to determine whether Detective Middleton properly arrested Defendant.

### 2.    Good Faith Exception

Even if the Court assumes the capias was issued in violation of the Fourth Amendment, the undersigned finds that the evidence obtained as a result of the arrest should not be excluded due to Detective Middleton's good faith reliance on the capias.

The Fourth Amendment commands:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The text of the Fourth Amendment provides no remedy for violations. However, the courts, in interpreting this amendment, have created a remedy - the exclusionary rule. See United States v. Leon, 468 U.S. 897, 906 (1984) (explaining that the exclusionary rule is "'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" (quoting United States v. Calandra, 414 U.S. 338, 348 (1974))); see also Arizona v. Evans, 514 U.S. 1, 10 (1995).

Notwithstanding, a court is not required to suppress evidence every time the Court finds that a warrant was issued in violation of the Fourth Amendment. See Leon, 468 U.S. at 908. The United States Supreme Court, in the seminal case of United States v. Leon, recognized a good faith exception to the exclusionary rule. See 468 U.S. at 913, 924; see also United States v. Glinton, 154 F.3d 1245, 1257 n. 11 (11th Cir. 1998) ("As set forth in

Leon, the good-faith rule allows the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." (internal quotation marks omitted)).

The Supreme Court, in Leon, stated that the application of the exclusionary rule should be reserved for those instances "'where its remedial objectives are thought most efficaciously served.'" 468 U.S. at 908 (quoting Calandra, 414 U.S. at 348).  In addition, it found that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  Id. at 916; see also Illinois v. Krull, 480 U.S. 340, 347 (1987) (recognizing that "the prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures" (internal quotation marks omitted)).  The Court further stated that "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  Leon, 468 U.S. at 921.  Therefore, the exclusionary rule should be not employed when the constitutional violation is the result of a judicial error.  See Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984); see also Evans, 514 U.S. at 11, 14-15 (concluding that an exception to the exclusionary rule exists when the constitutional error is attributable to court employees and indicating that "[w]here the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted" (internal quotation marks omitted)); United States v. Martin, 297 F.3d 1308, 1320 (11th Cir. 2002) (opining that "[u]nless the issuing judge wholly abandons his role . . . , then the officer need not pay for the judge's mistake and the Leon good faith exception should apply").  The

Court explained that the exclusion of evidence in these instances would not have a significant deterrent effect because the judges do not have a stake in the outcome of the case and "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." Leon, 468 U.S. at 916-17.

The Supreme Court in Leon also concluded that a law enforcement officer cannot be expected to second-guess the judge's decision that there is a probable cause or that the warrant is technically sufficient. See id. It opined, "'[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.'" Id. As a result, the "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id. at 918.   The rule "should not be applied[] to deter objectively reasonable law enforcement activity." Id. at 919.   The operative inquiry in determining whether an officer acted in an objectively reasonable manner is: "whether a reasonably well trained officer would have known that the search [or seizure] was illegal despite the [judge's] authorization." Id. at 922 n.23; see also Martin, 297 F.3d at 1318. The court must consider the totality of the circumstances in making this determination. See Leon, 468 U.S. at 922 n.23; see also Martin, 297 F.3d at 1309 (finding that the court may look outside the four corners of the affidavit in determining whether the officer acted in objective good faith).  The government "bears the burden of demonstrating the applicability of the Leon good faith exception." United States v. Robinson, 336 F.3d 1293, 1297 (11th Cir. 2003).

On the other hand, the Supreme Court acknowledged the following four instances in which the good faith exception should not be applied and the evidence should be excluded: (1) the judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth"; (2) the judge "wholly abandoned his [or her] judicial role"; (3) the "warrant [was] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the "warrant [was] so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers [could]not reasonably presume it to be valid." Leon, 468 U.S. at 923 (internal quotation marks omitted); see also Robinson, 336 F.3d at 1296; Martin, 297 F.3d at 1313.

Defendant does not assert that any of these four exceptions to the Leon good faith doctrine are applicable. Instead, he argues that the good faith exception is not applicable because the constitutional error in this case is attributable to law enforcement. See Second Tr. at 91-93, 112-13. Thus, he asserts the purpose of the exclusionary rule will be served and the evidence obtained as a result of the execution of the capias should be excluded. See id. at 92-93. The government, on the other hand, alleges that the constitutional error, if any, in this case is the result of the state court judge's actions and not the officers' conduct. See id. at 100-01, 103-05. Thus, it contends that the purpose of the exclusionary rule will not be served and the evidence should not be excluded because the officers acted in good faith. See id. at 101.

Assuming the capias was issued in violation of the Fourth Amendment, the evidence establishes that the error cannot be attributed to law enforcement.[17]  On September 29, 2004, Detective Middleton met with Mr. Zolezzi after Defendant's pretrial hearing at the Putnam County courthouse to inform him of the Order Revoking Bond.  See id. at 31, 53. Mr. Zolezzi told Detective Middleton that the judge refused to accept Defendant's waiver of appearance at the pretrial conference and ordered Defendant to appear in person at the next pretrial hearing, which was scheduled for October 28, 2004.[18]  See id. at 32.  The court issued a notice of hearing, which notified Defendant of the pretrial hearing set for October 28, 2004.  See Defendant's Ex. 2.  The notice stated, "This is your NOTICE TO APPEAR ON 10/28/2004 at 09:00 am before the HONORABLE A W NICHOLS III in Courtroom 217 of the PUTNAM COUNTY COURTHOUSE, PALATKA, FL 32177[.]"  Id.  It is unclear whether Defendant received this notice and there is no testimony indicating whether Mr. Zolezzi informed him that his personal presence was required.  Detective Middleton did not attend either pretrial hearing, never heard the judge's comments, and did not review the

---

[17]       Defendant asserts that the good faith exception to the exclusionary rule is inapplicable when the error that resulted in the constitutional violation can be attributed to any member of the executive branch.  See Second Tr. at 92.  Thus, in this case, Defendant contends that the errors of either the prosecutor or the officers led to the constitutional violation.  See id. at 91-92.  While there is some support for Defendant's position, see United States v. Gonzalez, 682 F. Supp. 46, 47 (S.D. Fla. 1987) (citing Albo v. State, 477 So. 2d 1071, 1075 n.5 (Fla. Dist. Ct. App. 3d 1985)), the Court finds that, in this case, the error can be attributed only to the state court judge.

[18]       Defendant's counsel argues that there is no evidence establishing that the judge actually ordered Defendant to appear in person at the October 28, 2004 pretrial hearing.  See Second Tr. at 112.  However, Detective Middleton's testimony regarding his conversation with Mr. Zolezzi along with the fact that the judge issued the capias after Defendant failed to appear at the October pretrial hearing but not after he failed to appear at the September pretrial conference are sufficient to establish that Detective Middleton believed the judge ordered Defendant to appear at the October pretrial conference.  See Defendant's Ex. 10; Government's Ex. 2.

judge's orders or any other documents relating to Defendant's appearance at the pretrial conferences.  <u>See</u> Second Tr. at 53-54.  While Detective Middleton could not recall precisely when he learned that Defendant failed to appear at the October 28, 2004 hearing and that a capias had been issued, he suggested it was probably a couple of days after the October hearing.  <u>See</u> <u>id.</u> at 54.  Accordingly, the issuance of the capias was not attributable to any act by Detective Middleton.

At the evidentiary hearing, Defendant's counsel suggested that the prosecutor likely requested the issuance of the capias.  <u>See</u> <u>id.</u> at 91-92.  Defendant alleges the error is therefore attributable to law enforcement (the prosecutor) and does not lie with the judge. <u>See</u> <u>id.</u>  However, these statements are merely argument of counsel.  Defendant presented no evidence or testimony to support these assertions.  In addition, the evidence in the record does not support Defendant's allegations.  Detective Middleton testified that Mr. Zolezzi told him that the judge refused to accept Defendant's waiver and ordered Defendant to appear at the next pretrial hearing.[19]  <u>See</u> <u>id.</u> at 32.  Moreover, the minutes from the October 28, 2004 hearing indicate that when Defendant did not appear, the judge ordered the issuance of a capias.  <u>See</u> Defendant's Ex. 10.  There is no evidence in the record to support Defendant's theory that the capias was issued at the request of the prosecutor.[20]       Defendant cites several state cases in support of his contention that

_____

[19]     Neither Defendant's counsel nor the government provided the Court with the minutes from the September 29, 2004 hearing or the Order Setting Pretrial.  <u>See</u> Government's Ex. 2.

[20]     Even if the prosecutor requested that the judge issue the capias, the good faith exception would still be applicable in this case.  The prosecutor would have requested the capias after the court rejected Defendant's waiver, required Defendant to be present at the next hearing, and issued the allegedly faulty notice.  Thus, the fault for any constitutional deprivation due to the

the good faith exception is not applicable.  <u>See</u> Second Tr. at 88-89.  However, the undersigned is not persuaded by these cases.  First, the cases are not binding because federal law controls this issue.  <u>See</u> <u>United States v. Clay</u>, 355 F.3d 1281, 1283 (11th Cir. 2004) (per curiam) (finding that "[i]t is established law of this Circuit that the admissibility in federal court of the products of state searches and seizures is controlled by federal law"), <u>cert. denied</u>, 125 S. Ct. 626 (2004) (unpublished table decision).

Next, the cases cited by Defendant are distinguishable.  Two of the cases, <u>State v. White</u>, 660 So. 2d 664, 668 (Fla. 1995), and <u>Pesci v. State</u>, 420 So. 2d 380, 381 (Fla. Dist. Ct. App. 3d 1982), involve the arrest of the defendant based on a void or nonexistent warrant.  In <u>Pesci</u>, 420 So. 2d at 381, the warrant had been quashed two months prior to the defendant's arrest, and in <u>White</u>, 660 So. 2d at 665, the warrant was executed four days prior to the defendant's arrest based on that same warrant.  While Defendant argues that this capias was also void, <u>see</u> Second Tr. at 89, the warrant was not void at the time of Defendant's arrest.  Indeed, Defendant did not move to quash the capias at any time in the state court proceedings and the court did not rescind it <u>sua sponte</u>.  <u>See</u> Government's Ex. 2.  Moreover, in these decisions, the fault can be attributable to law enforcement because it was the police department's failure that resulted in the constitutional violation. <u>See</u> <u>White</u>, 660 So. 2d at 667; <u>Pesci</u>, 420 So. 2d at 382.[21]  Conversely, the undersigned

_____

issuance of the capias still lies with the judge.

[21]     In addition, the <u>Pesci</u> case was decided more than a decade before the United States Supreme Court issued its decisions in <u>Leon</u> and <u>Evans</u>.

has concluded that any error in this case can only be attributed to the judge.  Thus, Defendant's argument based on these cases is unavailing.

Finally, Shadler v. State, 761 So. 2d 279, 280 (Fla. 2000), is distinguishable because the illegal arrest was not based on a warrant.  Instead, the officer relied on inaccurate information provided by an agency of the executive branch.  See id. at 280, 284.  In this case, the constitutional error was not the information provided via the dispatcher;  the capias was still valid and the dispatcher provided accurate information.  Instead, the alleged error was in the issuance of the capias by the judge.  Thus, the Shadler decision does not support a finding that the error in this case is attributable to law enforcement or any executive agency.

There are unpublished decisions from the Fourth and Sixth Circuits, however,  that address factually similar circumstances and are persuasive.  In United States v. Hickman, the court granted the prosecutor's request for a capias when the defendant failed to appear at a hearing.  See 83 F.3d 416, 1996 WL 191937, at *1 (4th Cir. Apr. 22, 1996) (per curiam) (unpublished table decision).  The officers subsequently learned about the issuance of the capias and executed it when they believed the defendant would be in possession of drugs.  See id. at *1.  While the capias was improperly issued and later rescinded after the defendant's arrest, the Fourth Circuit concluded that "because the vice officers acted upon a facially valid warrant and had no reason to question its validity, the district court properly applied the good faith exception to the exclusionary rule, as the capias was issued due to the judge's error alone."  Id.

-25-

The Sixth Circuit in <u>United States v. Gordon</u> reached a similar conclusion.  <u>See</u> 50 F.3d 11, 1995 WL 108988, at *4 (6th Cir. Mar. 14, 1995) (unpublished table decision).  In <u>Gordon</u>, a constitutionally deficient bench warrant was issued for the defendant's arrest.  <u>See</u> <u>id.</u> at *4. The officer arrested the defendant based on this outstanding warrant, but did not review the warrant or affidavit prior to the defendant's arrest.  <u>See</u> <u>id.</u> at *3.  The Sixth Circuit concluded that the defects in the bench warrant were attributable only to the judge and his staff and were not apparent from the face of the warrant.  <u>See</u> <u>id.</u> at *4.  Thus, it opined that "it would be improper to bestow a windfall upon [the defendant] when there is no evidence that [the detective] . . . had any reason to know of these deficiencies."  <u>Id.</u>

Likewise, in this case, Detective Middleton acted on a capias issued by the state court judge.  None of the alleged deficiencies identified by Defendant are apparent from the face of the warrant.  The undersigned finds that like the officer in <u>Sheppard</u>, Detective Middleton "took every step that could reasonably be expected of [him]."  468 U.S. at 989. In addition, there is no evidence that Detective Middleton was aware of the alleged deficiencies or that a reasonably well-trained officer would have been aware that the capias was improperly issued due to the lack of notice or rejection of the waiver.  Indeed, in the intervening month between the issuance of the capias and the arrest of Defendant, neither Defendant nor his counsel sought to quash the capias.  <u>See</u> Government Ex. 2.  Thus, even they behaved as if the capias was validly issued.  Just as the officer was not held responsible for the court clerk's failure to follow the standard court procedure in <u>Evans</u>, 514 U.S. at 5, 15, Detective Middleton should not be liable for the state court's failure to follow the procedural rules in this case.

The exclusionary rule should not be applied in this case.  No illegal police action is found here.  Indeed, no evidence suggests that either Detective Middleton or the prosecutor had any involvement in the issuance of the capias.  Once Detective Middleton learned that the capias had been issued, he had no reason to challenge its issuance.  See Leon, 468 U.S. at 921; United States v. Young, 229 F. Supp. 2d 1325, 1328 (M.D. Ala. 2002), aff'd, No. 03-10435, 88 Fed. Appx. 385 (11th Cir. Nov. 20, 2003) (unpublished table decision); cf. Sheppard, 468 U.S. at 989 (refusing "to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested").  Detective Middleton understood that the judge had refused to accept Defendant's waiver, ordered Defendant to appear in person, and Defendant failed to appear.  See Second Tr. at 32, 54.  Even if Detective Middleton had reviewed the underlying documents or attended the hearing, the undersigned finds that a reasonably well-trained officer would not have identified the alleged illegality.  Furthermore, prior to effectuating the stop, Detective Middleton asked the dispatcher to confirm the validity of this warrant.  See id. at 33-34.  As a result, Detective Middleton should not be punished for the judge's error as the officer acted in objective good faith reliance that the capias did not violate the Fourth Amendment and the operation of the exclusionary rule in this case would not serve its remedial purpose.  Therefore, the capias does not provide any basis for the exclusion of evidence in this case.

### C.    Whether There Was Probable Cause to Search the Vehicle

Defendant also asserts that there was no probable cause to search his truck because the initial sweep of the vehicle did not reveal any drugs.  See Second Tr. at 95-96,

-27-

117.  The government, on the other hand, contends that there was probable cause to search the vehicle based on the three grams of marijuana found on Defendant's person after he was arrested.  See id. at 102.  It alleges that "finding illegal narcotics on a defendant's person when searching him incident to arrest after they have just left a vehicle gives officers probable cause to do a warrantless search of that vehicle."  Id.

While the Fourth Amendment generally requires the issuance of a warrant prior to a search, there is an exception for automobiles.  See Maryland v. Dyson, 527 U.S. 465, 466 (1999) (per curiam).  Thus, an officer is permitted to conduct a warrantless search of a vehicle when "(1) there is probable cause to believe the vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure."  United States v. Talley, 108 F.3d 277, 281 (11th Cir. 1997) (per curiam) (internal quotation marks omitted).  However, the United States Supreme Court has held that a separate showing of exigency is not required when the vehicle is readily mobile.  See Dyson, 527 U.S. at 467.  In this case, there is no dispute that Defendant's truck was readily mobile.  Therefore, the validity of this search turns on whether there was probable cause to believe that the vehicle concealed contraband or other evidence.

As "[t]he burden of proving an exception to the warrant requirement rests with the government," United States v. McGough, 412 F.3d 1232, 1237 n.4 (11th Cir. 2005), the government must show that there was probable cause to support this search.  "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v.

Gates, 462 U.S. 213, 232 (1983); see also Maryland v. Pringle, 540 U.S. 366, 370-71 (2003).  The court must consider the totality of the circumstances in determining whether there was probable cause.  See Gates, 462 U.S. at 238.  It should not assess individual or isolated facts, but evaluate "the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers." United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990) (internal quotation marks omitted); see also United States v. Flynn, 664 F.2d 1296, 1304 (5th Cir. 1982).[22]

Probable cause is an objective determination.  See Devenpeck v. Alford, ___ U.S. ___, 125 S. Ct. 588, 593-94 (2004); United States v. Roy, 869 F.2d 1427, 1432 (11th Cir. 1989).  It "exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992).  "While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough." Id. "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Pringle, 540 U.S. at 370 (internal quotations marks omitted).

The government asserts that the three grams of marijuana found on Defendant's person after his arrest was, in and of itself, sufficient to establish probable cause that there was additional contraband in the truck.  See Second Tr. at 102-03.  Indeed, Detective Middleton testified he searched the vehicle "because [he] found the marijuana on

---

[22]      This case is binding precedent pursuant to Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

[Defendant's] person." Id. at 78.  However, Detective Middleton was never asked to detail

all of the information that formed the basis of his belief that he had probable cause to

search the vehicle.  Instead, the government argues that the decision in United States v.

Freire, 710 F.2d 1515 (11th Cir. 1983), supports a holding that finding narcotics on an

individual is sufficient to establish probable cause to search the entire vehicle.  See

Opposition ¶ 5.  However, the Freire decision does not appear to support such a broad

proposition.  In Freire, the contraband was not found on the defendant's person, but rather

it was found on the ground near the passenger's feet after he exited the vehicle.  See 710

F.2d at 1517.  The Eleventh Circuit concluded that:

> The agents in the instant case clearly had probable cause to believe that
> cocaine was secreted in the automobile because of the folded dollar bill
> discovered as [the defendant] exited the car.  A substantial amount of
> cocaine can be carried in a normal size briefcase, and the totality of the
> surrounding circumstance afforded the agents ample reason to suspect that
> additional contraband could be found in the briefcases.

Id. at 1523.  The decision does not provide any further explanation for its conclusion,[23] and

as a result, it does not directly support the broad conclusion that merely finding a small

amount of drugs on an individual is sufficient, without more, to establish a fair probability

that additional contraband is secreted in the vehicle.  Indeed, the court's reliance on the

---

[23]     It is unclear from a review of the opinion whether the contraband fell out of the car
when the defendant exited or whether it fell from the defendant's person.  See id. at 1517, 1523.
There are several cases that have concluded that when contraband is in plain view in a vehicle,
then that is sufficient to support a warrantless search.  See United States v. Lara, 517 F.2d 209,
211 (5th Cir. 1975); United States v. Delyea, 703 F. Supp. 83, 84 n.6 (M.D. Ga. 1989); see also
United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002).  Thus, the court may have been implicitly
relying on this authority to reach its conclusion.

"totality of the circumstance" suggests that the court did not focus solely on the cocaine in the dollar bill to determine that probable cause existed.[24]  See Freire, 710 F2d. at 1523.

While the undersigned expresses grave reservations as to whether the discovery of a small amount of marijuana on a defendant's person alone would be sufficient to establish probable cause to conduct a warrantless search of that person's vehicle, there are other facts in this case that when considered along with the discovery of the marijuana convince the undersigned that there was probable cause to search the vehicle in the case at bar.[25]

In determining whether there was probable cause for the search, a court is not limited to the officer's testimony regarding what information established probable cause to search or whether there was probable cause.  See United States v. Gray, 659 F.2d 1296, 1300-01 (5th Cir. Unit B Oct. 26, 1981) (concluding "that conduct which in fact does not violate the strictures of the fourth amendment cannot come within the scope of the rule" and that there was probable cause for the warrantless search despite the officer's statement to the contrary);[26] see also United States v. Sealed Juvenile 1, 255 F.3d 213,

─────────────

[24]    The court's opinion details other relevant facts which included: DEA agents discovering four kilograms of cocaine secreted in a shipment of furniture; the defendant's vehicle accompanying a van that picked up the shipment; the defendant's vehicle then accompanying a second van into which the shipment was transferred; the defendant's vehicle and the van containing the shipment communicating on the highway; and both vehicles undertaking counter surveillance tactics.  See id. at 1517.

[25]    Despite the undersigned's reservations, at least one circuit court has concluded that this fact alone adequately establishes probable cause.  See United States v. Johnson, 383 F.3d 538, 545-46 (7th Cir. 2004).

[26]    This case is binding precedent on this Court.  See Stein, 667 F.2d at 34.

219 (5th Cir. 2001).  Instead, the court must review the circumstances and "determine the existence of probable cause by an objective standard."  Gray, 659 F.2d at 1300 (citing United States v. Clark, 559 F.2d 420, 425 (5th Cir. 1977).  This principle would appear all the more applicable where, as here, unlike in Gray, see 659 F.2d at 1300 & n.7, the officer was never asked to detail all of the information that formed the basis for his probable cause determination.  Instead, the government simply asked one leading question regarding the marijuana.  See Tr. at 78.  Detective Middleton's response to that question does not suggest that he had forgotten or chose not to consider all of the other information he knew regarding Defendant at that time.  The holding in Gray cautions that the Court should not limit its evaluation of the existence of probable cause to the basis asserted.  See Gray, 659 F.2d at 1300-01.  Instead, as a reviewing court must determine the existence of probable cause by an objective standard, this Court must consider all of the information that Detective Middleton knew at the time he decided to seize the vehicle and conduct the warrantless search.  See id.

In this case, Detective Middleton knew that he had previously stopped Defendant less than five months before and found marijuana on his person and substantial amounts of both cocaine and crack cocaine concealed in the truck that he was driving.  See First Tr. at 14, 21-22; see also Second Tr. at 17, 41.  This stop was the basis for the state court criminal proceedings.  See Government's Ex. 2.  Although Detective Middleton's initial search of the truck at the scene of the stop yielded no contraband, see id. at 73-74, he also testified that he was aware of "previous incidents with Mr. Walker where drugs had been

found in certain cavities of the car." Second Tr. at 40.  On September 17, 2004, while Defendant was on bond during the state court prosecution, Detective Middleton executed a search warrant and found "numerous items of narcotics as well as paraphernalia" at Defendant's residence.  Id. at 28;  see also id. at 41, 50; Government's Ex. 2.  In addition, the circumstances of the stop in this case were similar to the stop conducted on July 30, 2004, where the officers found a large amount of narcotics secreted in the vehicle that Defendant was driving.[27]  Both in this instance and on July 30, 2004, Defendant was traveling alone in the early afternoon from a residence in Crescent City, Florida, via Highway 17.  See First Tr. at 14-16, 25; Second Tr. at 10, 33.  In addition, in both instances, a small amount of marijuana was found on Defendant's person as a result of a search incident to his arrest.  See First Tr. at 21; Second Tr. at 18, 37.  Finally, Detective Middleton knew that Defendant had tried "to get away" when the stop was attempted.[28] See id. at 19.

Upon consideration of the all of the foregoing, the undersigned finds that there was a fair probability that contraband was concealed in Defendant's vehicle.  While the probable

---

[27]    The undersigned is permitted to consider a past pattern of conduct in determining whether there was probable cause to search the vehicle.  See Flynn, 664 F.2d at 1305.

[28]    Detective Middleton testified that Defendant refused to stop despite the activation of his blue lights and sirens and a specific direction from Detective Middleton.  See Second Tr. at 34.  However, Defendant explains that he was not fleeing, testifying that the vehicle in which Detective Middleton was traveling bore no police insignia and that he did not know police officers were occupying the vehicle.  See id. at 11.  Indeed, Defendant testified that he believed the driver of the vehicle was a drunk driver.  See id. at 19.  For the purposes of this analysis, the Court will accept the Defendant's testimony, i.e. simply that he was "trying to get away from the truck."  See id.  However, the fact remains that Detective Middleton, as the pursuing officer, would only have been certain that the Defendant attempted to "get away"; his true motivation for doing so could not have been established at that time.

cause determination turns based on the particular facts presented in the case, a review of other cases in the Eleventh Circuit illustrates the type of information needed to meet this threshold.  For example, in <u>Talley</u>, the court concluded that there was probable cause to search the defendant's vehicle when the officer corroborated, at least in part, a tip from an informant that the defendant was carrying narcotics in his pants, the defendant departed the residence with a visible bulge in his pants, and the officers found crack cocaine on the defendant after a pat down search.  <u>See</u> 108 F.3d at 279, 281-82.  Even though the officers did not have any information that there was additional contraband concealed in the vehicle, the Eleventh Circuit found that the warrantless search of the vehicle was proper.  <u>See</u> <u>id.</u> at 281-82.

In addition, in <u>United States v. Butler</u>, the court found there was sufficient probable cause to justify the warrantless search of a vehicle when officers had found $1,200 hidden behind the visor of the vehicle during a search incident to the defendant's arrest, the officers knew that the defendant had previously been convicted of a drug felony, and the ownership of the vehicle was in controversy.  <u>See</u> 102 F.3d 1191, 1199 (11th Cir. 1997). Finally, a district court in Georgia concluded that there was sufficient probable cause to search a vehicle when the officers found $8,000 on the defendant's person, the officers had found drugs and cash in the house at which the car was parked, there was a cash wrapper that connected the money in the defendant's possession to the cash found in the house, the defendant's vehicle was registered in Florida, and the defendant provided an inconsistent statement regarding the cash.  <u>See</u> <u>United States v. Chapman</u>, 196 F. Supp. 2d 1279, 1283, 1287 (M.D. Ga. 2002).  The court found there was sufficient probable cause

despite the fact that no drugs were found on the defendant's person or in plain view in the vehicle and the officers did not have any specific information that there were drugs contained in the vehicle.  <u>See</u> <u>id.</u>  These cases demonstrate that the type and amount of information that Detective Middleton possessed in this case was sufficient to establish probable cause to search Defendant's vehicle.

Although the facts of this case may present a close call, the undersigned is persuaded that Detective Middleton had probable cause to believe that there was additional contraband concealed in the vehicle and the search of the vehicle was proper.

## **RECOMMENDATION**

In light of the foregoing, it is hereby **RECOMMENDED**:

Defendant's Second Motion to Suppress Results of Illegal Seizure and Search on December 16, 2004 (Dkt. No. 22) should be **DENIED**.

**ENTERED** at Jacksonville, Florida, this 26th day of August, 2005.

**MARCIA MORALES HOWARD**
United States Magistrate Judge

-35-

lc1

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

All Counsel of Record
Pro Se Parties